Filed 4/8/14  P. v. Walker CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E055383 |
| v. | (Super.Ct.No. FSB1001076) |
| MILTON CARNELL WALKER et al., | **OPINION** |
| Defendants and Appellants. | |

APPEAL from the Superior Court of San Bernardino County.  Michael A. Smith, Judge.  (Retired judge of the San Bernardino Super. Ct. assigned by the Chief Justice pursuant to art. VI, § 6 of the Cal. Const.)  Affirmed.

Robert Franklin Howell, under appointment by the Court of Appeal, for Defendant and Appellant Milton Carnell Walker.

Boyce & Schaefer and Robert E. Boyce, under appointment by the Court of Appeal, for Defendant and Appellant Jerome Walker.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Senior Assistant Attorney General, and William W. Wood and Meagan J. Beale, Deputy Attorneys General, for Plaintiff and Respondent.

Defendants Milton Carnell Walker and Jerome Carnell Walker are brothers. They got into a confrontation with the victim at the doorway of a convenience store; Jerome later claimed that the victim (who was plainly drunk) closed the door on his foot. Jerome told the victim to watch out; the victim told him to watch out. Milton then started punching the victim. Jerome joined in. Less than a minute later, the victim lay unconscious in the parking lot, with a skull fracture that led to his death.

A jury found defendants guilty on one count of second degree murder. (Pen. Code, §§ 187, subd. (a), 189.) They were each sentenced to 15 years to life in prison, plus the usual fines and fees.

In this appeal, they contend:

1. There was insufficient evidence of implied malice.

2. The trial court erred by instructing, "If the defendant committed an assault by means of force likely to produce great bodily injury, or if the defendant acted with conscious disregard of the risk to human life, then the offense is either murder or voluntary manslaughter."

3. The trial court erred by failing to instruct that a nonmalicious killing in the course of a noninherently dangerous felony is manslaughter.

4.  The prosecutor committed misconduct by misstating the law in closing argument.

5.  Milton's trial counsel rendered ineffective assistance in closing argument.

6.  The trial court erred by denying Milton's new trial motion based on an incorrect legal standard.

Ultimately, we find no prejudicial error.  Accordingly, we will affirm.

I

FACTUAL BACKGROUND

A.    *The Case Against Defendants*.

Three trial witnesses (other than defendants) saw and heard the confrontation between defendants and the victim.  The confrontation was also captured on video by store security cameras.

It was March 11, 2010, around 5:55 p.m.  Nathan Macon was standing outside the front door of Jimmy's Food Store in San Bernardino.  Macon was 63 years old and five feet, ten inches tall; he weighed about 170 pounds.  Milton was 21 years old and Jerome was 22.  Both Milton and Jerome were five feet eleven inches tall and about 150 pounds.

Milton entered the store, followed by Jerome.  Witnesses heard Jerome tell Macon, "Watch out."  Macon retorted, "No, you need to watch out."  Jerome continued walking into the store, away from Macon.

Milton, however, walked back to Macon and told him, "No, you watch out."  Milton then punched Macon in the face.  He threw about 10 or 12 punches, moving

3

forward as Macon moved back and into the parking lot. Meanwhile, Jerome walked back and joined in punching Macon. Macon did not fight back.

Finally, Milton knocked Macon backward onto the pavement. Macon was lying on the ground, motionless. Nevertheless, Jerome punched him in the face two or three times. Defendants then got into their car and drove away.

According to one witness, when Milton knocked Macon down, "[Macon's] head bounced three times . . . off the parking lot . . . ." She also testified that, every time Jerome hit Macon while he was on the ground, his head "bounc[ed] up and down." However, she had not mentioned such "bouncing" to the police. The same witness also testified that after the confrontation, defendants were laughing. However, she had not mentioned this to the police, either.

Macon was bleeding from the eyes and mouth. When the police arrived, his eyes were blinking and his hands were twitching, but he was nonresponsive. He was taken to a hospital, where he was found to have a skull fracture on the right side of the back of the head. The brain itself was bruised, and blood had collected on the brain surface. Macon's blood alcohol level was 0.23 percent.

On March 12, Macon had two operations to relieve the pressure from swelling of his brain. Sometime before March 15, he had a stroke. On March 23, after being taken off life support at the request of his family, he died. The cause of death was "blunt force head injury."

4

When defendants heard the police were investigating the fight, they threw away the clothes they had been wearing. However, after the police contacted Milton by phone, both defendants turned themselves in.

B.    *Milton's Trial Testimony*.

Milton testified that, as he went into the store, Macon was just coming out. Milton said, "What's up?" Then he heard Jerome say, "Watch where you're going. You just closed the door on my foot." Macon said, "You know who you fucking with? I'm a Macon." He said his family would kill Jerome. He also threatened to "cut" Jerome.

Milton asked, "What's your problem?" Macon replied, "What the fuck you going to do about it? I'll cut you, too," then moved toward him. Milton thought Macon was going to attack him, so he punched him in the face. They started fighting; Macon was trying to fight back but succeeded in landing only one blow (which Milton described as a slap).

Milton admitted knowing that Macon was drunk. He also admitted knowing that Macon was "an old man."

Milton denied thinking about killing Macon. He denied laughing. He did not think Macon was seriously injured.

C.    *Milton's Account to the Police*.

Milton had given the police essentially the same account to which he testified in court.

5

Milton had told the police that he saw Macon "diggin[g] in his pocket" with his left hand, and he thought Macon had a knife. The video, however, showed Macon's left hand consistently down at his side.

Milton had also admitted to the police that he saw Macon's head hit the ground: "Like hard. Like, you know, when your neck snap?"**1**

---

**1** Milton did himself no favors by his almost comical evasiveness on this point at trial:

"Q (By [prosecutor]) You hit him, his head hits the ground and snaps back?

"A Yes, he hits the ground.

"Q His head hits the ground and snaps back?

"A He hits the ground.

"Q What I'm asking, not whether he hit the ground, but whether his head hit the ground and snapped back?

"[MILTON'S COUNSEL]: Objection. Asked and answered.

"[JEROME'S COUNSEL]: Objection. Asked and answered.

"THE COURT: The objection is sustained as being compound.

"Q (By [prosecutor]) Did his head hit the ground?

"A Yes, he hit the ground.

"Q (By [prosecutor]]) His head hit the ground?

"A He hit the ground.

"[PROSECUTOR]: Mr. Walker, I just need you to answer my question, okay, if you can.

"[MILTON'S COUNSEL]: Your Honor, argumentative.

"THE COURT: Overruled.

*[footnote continued on next page]*

*[footnote continued from previous page]*

"Q  (By [prosecutor])  Did his head hit the ground?

"[JEROME'S COUNSEL]:  Objection.  Asked and answered.

"THE COURT:  Overruled.

"THE WITNESS:  His head is a part of his body.  He hit the ground.

"Q  (By [prosecutor])  So, his head hit the ground, also?

"A  Yes, he hit the ground.

"Q  And as his head hit the ground, his head snapped back?

"A  Yeah, I seen him hit the ground.

"Q  So, his head bounced off the pavement?

"A  I seen him hit the ground, yes.

"Q  And, and you saw his head hit the ground and kind of bounce and jerk up?

"[JEROME'S COUNSEL]:  Objection.  Misstates the testimony, your Honor.

"THE COURT:  Overruled.  He can answer whether or not he saw that.

"THE WITNESS:  I seen his head hit the ground.  I seen him hit the ground.

"Q  (By [prosecutor])  And snap and bounce?

"A  I seen him hit the ground.

"Q  And it snapped back?

"[JEROME'S COUNSEL]:  Asked and answered.

"[MILTON'S COUNSEL]:  Asked and answered, your Honor.

"THE COURT:  Overruled.

"Q  (By [prosecutor])  And it snapped back?

"A  I seen his head hit the ground.

*[footnote continued on next page]*

D.     *Jerome's Trial Testimony*.

Jerome testified that, as he entered the store, Macon closed the door on his leg. Jerome asked, "[W]hat [is your] problem[?]" and added, "[You] need[] to watch out." Macon replied, "Do you know who you're messing with?  I'm a Macon."  Jerome just ignored him and walked away.

When Jerome saw Milton and Macon fighting, he felt that he had to help his brother.  He admitted that he did not hear Macon make any threats.  He also admitted that he was not afraid.

Jerome admitted that Macon appeared too drunk to drive.  He also admitted knowing that Macon was "older," with gray hair.

Jerome denied thinking that Macon might be killed.  He denied laughing.

E.     *Jerome's Account to the Police*.

Jerome had given the police essentially the same account to which he testified in court.  However, when asked why he hit Macon when Macon was already on the ground, he told police, "Probably just mad.  I shouldn't have."

---

*[footnote continued from previous page]*

"Q  Well, you remember telling Detective Carr that you saw his head hit the ground and snap back?

"A  I remember telling him that I seen his head hit the ground.

"Q  And snap back?

"A  That's what I seen him do."

8

## II

## THE SUFFICIENCY OF THE EVIDENCE OF IMPLIED MALICE

Jerome contends that there was insufficient evidence of implied malice.

"'[W]hen a defendant challenges the sufficiency of the evidence, "'[t]he court must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence — that is, evidence which is reasonable, credible, and of solid value — such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' [Citation.]" [Citations.] "Substantial evidence includes circumstantial evidence and any reasonable inferences drawn from that evidence. [Citation.]" [Citation.] We ""'"presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence."' [Citation.]" [Citation.]' [Citation.]" (*People v. Lopez* (2013) 56 Cal.4th 1028, 1069.)

"A conviction for murder requires the commission of an act that causes death, done with the mental state of malice aforethought (malice). [Citation.] Malice may be either express or implied. [Citation.] . . . Implied malice does not require an intent to kill. Malice is implied when a person willfully does an act, the natural and probable consequences of which are dangerous to human life, and the person knowingly acts with conscious disregard for the danger to life that the act poses. [Citation.]" (*People v. Gonzalez* (2012) 54 Cal.4th 643, 653.)

"'Normally, hitting a person with the hands or feet does not constitute murder in any degree. [Citations.] But if death or great bodily harm is a reasonable or probable

9

consequence of the beating the offense may be murder. [Citation.] Thus, to constitute murder there has to be either an intent to kill or such wanton and brutal use of the hands without provocation as to indicate that they would cause death or serious bodily injury so as to indicate an abandoned and malignant heart.' [Citations.]" (*People v. Zankich* (1961) 189 Cal.App.2d 54, 67.)

In *People v. Cravens* (2012) 53 Cal.4th 500, the Supreme Court found sufficient evidence that a single punch by a fist, resulting in death, was committed with implied malice. It explained that the "defendant targeted a smaller and shorter victim who was intoxicated, exhausted, and vulnerable." (*Id*. at p. 508.) "And it was a very hard punch. Witnesses described it as 'extremely hard' and 'one of the hardest punches I've ever seen thrown.'" (*Id*. at p. 509.) "Moreover, the jury could reasonably have found that defendant secured himself every advantage to ensure that he could inflict the greatest possible injury on his victim. Not only was defendant bigger and taller, but he gained extra inches of height for his punch by standing on the curb while [the victim] was at street level. Defendant's conduct thus guaranteed that [the victim] would fall on a very hard surface, such as the pavement or the concrete curb. 'The consequences which would follow a fall upon a concrete walk must have been known to [defendant].' [Citations.]" (*Ibid*.) Finally, the court noted that the fatal blow was a "sucker punch," delivered "without warning" when the victim "posed no threat and was not behaving in an aggressive manner." (*Ibid*.)

Basically, Jerome argues that there was less evidence of implied malice here than in *Cravens*. However, *Cravens* merely held that the evidence of implied malice in that case was sufficient; it did not purport to hold that any less evidence would have been insufficient.

A more helpful case is *People v. Alexander* (1923) 62 Cal.App. 306, which *Cravens* cited with apparent approval. (*People v. Cravens*, *supra*, 53 Cal.4th at p. 509.) In *Alexander*, codefendants Avilla and Alexander accosted a stranger. Avilla grabbed the victim's right hand and said, "You are one of these wise guys from Alameda that hit me before." (*Alexander*, *supra*, at p. 307.) The victim replied, "No, you are badly mistaken," and smiled. (*Ibid.*) When the victim tried to break away, Avilla "struck [him] in the face, knocking him down. As the [victim] fell the back of his head struck upon the hard pavement of the street, causing a basal fracture of the skull. [The victim] never regained consciousness, but died a short time thereafter. It appears that the [victim] was a young man of frail build; that throughout the occurrence he kept his left hand in his pocket, and that he made no resistance and no threats of any kind against either of the defendants." (*Id.* at pp. 307-308.)

The appellate court held that there was sufficient evidence that the crime was murder rather than manslaughter: "[The defendants] deliberately pursued the deceased and . . . the blow was struck while the deceased had his left hand in his pocket and while the appellant Avilla held his right hand, thus causing him to fall backward, with his head striking upon the hard pavement and without any opportunity of defending himself

11

against the fall.  It is presumed 'that a person intends the ordinary consequence of his voluntary act' [citation], and [Avilla] must be presumed to have known that by holding the only free hand of the deceased fatal injuries would result from the striking of his head upon the hard pavement."  (*People v. Alexander*, *supra*, 62 Cal.App. at pp. 308-309.)

Another informative case is *People v. Tubby* (1949) 34 Cal.2d 72.  There, the defendant was 29, six feet tall, and 175 pounds, whereas the victim was 82, 100 pounds, and "feeble."  (*Id*. at p. 74.)  The defendant punched the victim once, then dragged him into a house; witnesses heard "thumping noises" coming from the house for "several minutes."  (*Id*. at p. 75.)  The defendant admitted that, once inside the house, he hit the victim two or three times; finally, after hitting him one more time, knocking him down, the defendant "'felt something snap and [he] knew [he] had done something . . . ."  (*Ibid*.)  The victim was left "semi-comatose"; he died later that day as a result of skull fractures.  (*Id*. at p. 76.)  The Supreme Court held that this evidence was "unquestionably sufficient to support a conviction of second degree murder . . . ."  (*Id*. at p. 79.)

Here, similarly, Milton punched the victim in the face, then kept punching him, forcing him back into the parking lot.  Finally, he hit him hard enough to knock him down; there was evidence that the victim's head "bounced three times . . . off the parking lot . . . ."  Jerome then punched the victim in the face at least twice.  Once again, the victim's head "bounc[ed] up and down."  In *Alexander*, Avilla hit the victim only once but made sure he would hit his head on the pavement by holding his right hand while his left hand was in his pocket.  Here, defendants likewise made sure the victim would hit his

head on the pavement by hitting him over and over again until he fell over backwards and by hitting him two more times when he was down. Like the defendant in *Tubby*, who admitted hitting the victim and feeling something "snap," Milton admitted hitting the victim and seeing his head hit the ground "hard . . . [l]ike . . . when your neck snap[.]"

Jerome argues that he was not larger than the victim; in fact, the victim outweighed him by 20 pounds. Nevertheless, both Milton and Jerome were 40 years younger. Moreover, as they were aware, the victim was drunk. Even more important, Jerome and Milton double-teamed the victim, thus overwhelming him.

Jerome also relies on *People v. Spring* (1984) 153 Cal.App.3d 1199. In that case, the defendant hit the victim only once; the victim did not fall down or lose consciousness. (*Id*. at p. 1203.) Thus, the court held that there was insufficient evidence of malice. (*Id*. at pp. 1204-1207.) It distinguished two other cases on the ground that there, "two men beat one victim." (*Id*. at p. 1205.) Here, of course, two men not only beat one victim, but they beat him with repeated blows that caused his head to hit the pavement repeatedly. Under *Spring* itself, this was sufficient evidence of malice.

III

CHALLENGES TO THE INVOLUNTARY MANSLAUGHTER INSTRUCTION

Defendants raise several contentions arising out of the trial court's instruction on involuntary manslaughter.

13

A.    *Additional Factual and Procedural Background.*

Defendants requested an instruction on involuntary manslaughter, on the theory that there was evidence that they committed an assault or battery without the intent to kill and without conscious disregard for human life.

In response, the prosecution requested "a provision . . . that, if instead of an assault or a battery, the jury finds that the defendants committed . . . an inherently dangerous felony, such as assault by means of force likely to produce great bodily injury, then involuntary manslaughter would not apply, and it would either be murder or . . . voluntary manslaughter . . . ."

The trial court acceded to both requests. It had the prosecutor draft a modified version of CALCRIM No. 580. It then delivered this instruction, as follows:[2]

"When a person commits an unlawful killing, but does not intend to kill, and does not act with conscious disregard for human life, then the crime is involuntary manslaughter, rather than murder or voluntary manslaughter.

"The difference between other homicide offenses and involuntary manslaughter depends on whether the person was aware of the risk to life that their actions created, and then consciously disregarded that risk.

---

[2]    In delivering the instructions orally, the trial court made frequent and apparently extemporaneous changes to the written instructions. This is a risky practice. The changes that it made to this particular instruction, however, were minor and not substantive.

14

"An unlawful killing caused by a willful act done with knowledge and awareness that the person is endangering the life of another and done in conscious disregard of that risk is voluntary manslaughter or murder.

"An unlawful killing resulting from a willful act committed without intent to kill, and without conscious disregard of the risk to human life, is involuntary manslaughter.

"A defendant commits involuntary manslaughter under the following circumstances:

"1. The defendant committed the crime of assault or battery. And,

"2. The defendant did not act with conscious disregard of the risk to human life.[3] And,

"3. The defendant's acts unlawfully caused the death of another person.

---

**3** This line, in both the written and oral instruction, deviated substantially from the corresponding line in the pattern instruction, which would have stated:

"2. The defendant committed the (crime/[or] act) with criminal negligence . . . ." (CALCRIM No. 580 (Apr. 2011 rev.).)

We find no explanation in the record for this deviation.

Defendants do not contend that this wording change constituted error; thus, they have forfeited any such contention. If only out of an excess of caution, however, we note that it was harmless under any standard. Admittedly, it resulted in the omission of one element of involuntary manslaughter; thus, it made the jury more likely to convict defendants of involuntary manslaughter rather than to acquit them entirely. What the jury actually did, however, was convict defendants of murder. In so doing, it necessarily rejected the lesser included offense of involuntary manslaughter, even though the wording change gave it the option of finding involuntary manslaughter even in the absence of criminal negligence. Thus, evidently it was convinced that defendants acted with either intent to kill or conscious disregard of the risk to human life.

15

"*If the defendant committed an assault by means of force likely to produce great bodily injury,* or if the defendant acted with conscious disregard of the risk to human life, *then the offense is either murder or voluntary manslaughter.*

"Additional instructions define the crimes of assault, battery, and assault by means of force likely to produce great bodily injury.

"*In order to prove murder or voluntary manslaughter, the People have the burden of proving beyond a reasonable doubt that a defendant acted either with intent to kill or with conscious disregard for human life.* If the People have not met this burden, you must find the defendant not guilty of murder or voluntary manslaughter." (Italics added.)

B.    *Violation of the "Merger Rule."*

Defendants contend that the trial court erred by instructing, "If the defendant committed an assault by means of force likely to produce great bodily injury, or acted with conscious disregard of the risk to human life, then the offense is either murder or voluntary manslaughter."

""""In reviewing [a] purportedly erroneous instruction[ ], 'we inquire "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way" that violates the Constitution.' [Citation.] In conducting this inquiry, we are mindful that '"a single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge."' [Citations.]" [Citation.] "Additionally, we must assume that jurors are intelligent persons and capable of

16

understanding and correlating all jury instructions which are given." [Citation.]' [Citation.]" (*People v. Castaneda* (2011) 51 Cal.4th 1292, 1320-1321.)

Under the first degree felony-murder rule, if a defendant kills, with or without malice, during the commission or attempted commission of one of the felonies listed in Penal Code section 189, the crime is first degree murder.

Similarly, under the second degree felony-murder rule, if a defendant kills, with or without malice, during the commission or attempted commission of an inherently dangerous felony not listed in Penal Code section 189, the crime is second degree murder. (*People v. Bryant* (2013) 56 Cal.4th 959, 965.)

This second degree felony-murder rule, however, is subject to a significant exception, known as the "merger rule": "[I]f th[e] inherently dangerous felony 'is assaultive in nature' [citations], the felony-murder rule does not apply, and a defendant may not be found guilty of murder without proof of malice." (*People v. Bryant*, *supra*, 56 Cal.4th at p. 966.)

For this reason, the challenged sentence in the instruction, when viewed in isolation, was erroneous. It indicated that, as long as a defendant committed assault by means of force likely to cause great bodily injury, he could be found guilty of murder even in the absence of intent to kill or conscious disregard. However, as the People point out, if the sentence had read "and" instead of "or," it would have been correct.

On the other hand, when the instruction is viewed as a whole and in connection with all of the other instructions, we see no reasonable likelihood that the jurors would have misunderstood the law.

The jury had already been told that murder requires malice aforethought, which was defined as either the intent to kill or the intentional commission of an act, the natural and probable consequences of which are dangerous to human life, with the knowledge that the act is dangerous to human life. (CALCRIM No. 520.) The jury was also told, "In order for you to find [a person] guilty of . . . murder . . . , the person must not only intentionally commit the prohibited act, but must do so with the required specific intent or mental state. Both the act and the specific intent or mental state that are required are explained in the instructions for murder . . . ." (CALCRIM No. 252.)

The challenged instruction then correctly informed the jury that "[w]hen a person commits an unlawful killing, but does not intend to kill, and does not act with conscious disregard for human life, then the crime is involuntary manslaughter, rather than murder or voluntary manslaughter." It also correctly informed the jury that an unlawful killing resulting from a willful act done *with* conscious disregard is murder or voluntary manslaughter, but an unlawful killing resulting from a willful act done *without* conscious disregard is involuntary manslaughter. Finally, it correctly informed the jury that "[i]n order to prove murder . . . , the People have the burden of proving beyond a reasonable doubt that a defendant acted either with intent to kill or with conscious disregard for

18

human life. If the People have not met this burden, you must find the defendant not guilty of murder . . . ."

To put it another way, the jury was told at least *four separate times* that murder requires either the intent to kill or conscious disregard for human life, and that if this element is missing, an unlawful killing is at most involuntary manslaughter. In this context, it is not reasonably likely that the jury gave so much weight to the use of the word "or" (rather than "and") as to conclude that an unlawful killing committed without the intent to kill and without conscious disregard for human life would be murder simply because it resulted from an assault by means of force likely to cause great bodily injury.

This case is analogous to *People v. Ruiz* (1988) 44 Cal.3d 589. There, the jury was instructed that, for purposes of murder by lying-in-wait, "[t]he lying-in-wait need not continue for any particular period of time provided that its duration is such as to show a state of mind equivalent to premeditation *or* deliberation." (*Id*. at p. 614, italics added.) The court noted that Penal Code section 189 defines "'murder . . . by . . . lying in wait, . . . or by *any other kind* of willful, deliberate, *and* premeditated killing'" as first degree murder. (*Id*. at p. 614, fn. 2, italics added.) It also noted that "proof of lying-in-wait . . . acts as the functional equivalent of proof of premeditation, deliberation *and* intent to kill. [Citations.]" (*Id*. at p. 614, italics added.) Nevertheless, it stated, "We think it unlikely the phrasing could have misled the jury, which in a separate instruction was correctly told that a wilful, deliberate *and* premeditated killing with malice aforethought is murder of the first degree." (*Id*. at p. 615.)

19

We find further support for our conclusion in *People v. Smith* (1973) 33 Cal.App.3d 51, disapproved on other grounds in *People v. Wetmore* (1978) 22 Cal.3d 318, 324, fn. 5, 327, fn. 7. There, the jury was instructed, "'Premeditation, deliberation, *or* intent to kill, and malice must be present for the killing to be first degree murder.'" (*Id*. at p. 67, italics added.) The court held that this use of "or" instead of "and" was erroneous but not prejudicial. It noted that the jury had been instructed that first degree murder was defined "as that perpetrated by '[w]illful, deliberate and premeditated killing,' formed 'upon pre-existing reflection' but not that produced by an 'unconsidered and rash impulse, even though it included an intent to kill . . . .'" (*Ibid*.) It had also been instructed "that if the murder . . . with malice and 'willfully, deliberately and with premeditation,' the murder was of the first degree, while a reasonable doubt as to premeditation would call for a verdict of second degree murder." (*Id*. at pp. 67-68.) It concluded, "Because of the instruction's emphasis on premeditation and the state of mind implied by it, it was unlikely that the jurors extracted the incorrect statement and utilized it out of context as a basis for the first degree murder verdict." (*Id*. at p. 68.)

We recognize that here, the use of "or" instead of "and" was not a mistake. The prosecutor specifically asked the trial court to instruct that, if a defendant committed assault by means of force likely to cause great bodily injury, as opposed to simple assault, malice was not required. Moreover, the trial court specifically agreed to do so. Nevertheless, because (1) the requested instruction was inserted into the midst of a set of pattern instructions repeatedly stating that murder does require malice, (2) the requested

20

instruction did not make it clear that it was stating an exception to this general rule, and (3) the requested instruction could be squared with the general rule simply by reading "or" as meaning "and," the prosecutor and the trial court completely failed to convey their intended meaning.

While the *Smith* court treated a similarly obvious substitution of "or" for "and" as harmless error, we believe the more straight forward approach is to hold that there was no error at all, because it is not reasonably likely that the jurors would have misunderstood the instructions taken as a whole.

C.      *Failure to Instruct on a Nonmalicious Killing in the Course of a*

        *Noninherently Dangerous Felony.*

Defendants also contend that the trial court erred by failing to instruct that a nonmalicious killing in the course of a noninherently dangerous felony is involuntary manslaughter.

As a broad general rule, a killing committed without malice but with criminal negligence constitutes involuntary manslaughter. (See *People v. Butler* (2010) 187 Cal.App.4th 998, 1006-1007 [involuntary manslaughter requires criminal negligence].) For historical reasons, however, any discussion of involuntary manslaughter tends to focus on whether the killing resulted from the defendant's commission of a crime and, if so, the nature of the underlying crime.

The first historical reason is that the felony murder rule has historically been — and still is — an exception to this general rule. Thus, if the defendant kills, with or

21

without criminal negligence, during the commission of a crime listed in Penal Code section 189, the killing is first degree murder, not involuntary manslaughter. And if the defendant kills — again, with or without criminal negligence — during the commission of an inherently dangerous but nonassaultive felony (other than those listed in Penal Code section 189), the killing is second degree murder, and again, not involuntary manslaughter.

The second historical reason is that in 1872, California's involuntary manslaughter statute was drafted in terms of a killing "[1] in the commission of an unlawful act, *not amounting to felony*; or [2] in the commission of a lawful act which might produce death, in an unlawful manner, or without due caution and circumspection . . . ." (Pen. Code, § 192, subd. (b), italics added.) Thus — presumably to accommodate the felony murder rule — it does not expressly address a killing in the commission of a felony.

As the law has developed, however, a felony that is not inherently dangerous to human life does not trigger the felony murder rule. (E.g., *People v. Howard* (2005) 34 Cal.4th 1129, 1132.) This created a gap in the law. A defendant who kills with criminal negligence in the course of a misdemeanor is guilty of involuntary manslaughter. (*People v. Wells* (1996) 12 Cal.4th 979, 984-989.) But what crime is it, if any, to kill with criminal negligence in the course of a noninherently dangerous felony? In *People v. Burroughs* (1984) 35 Cal.3d 824, disapproved on other grounds in *People v. Blakeley* (2000) 23 Cal.4th 82, 89, the Supreme Court plugged this gap by holding that that, too, is involuntary manslaughter. (*Id*. at pp. 835-836 & fn. 9.)

22

The adoption of the merger rule created a similar gap in the law. Under the merger rule, a nonmalicious killing in the course of an inherently dangerous assaultive felony is not murder. But what crime, if any, is it?

*People v. Garcia* (2008) 162 Cal.App.4th 18 held that a nonmalicious killing in the course of an inherently dangerous assaultive felony is voluntary manslaughter. (*Id*. at p. 31.) Jerome therefore argues that, if assault by means of force likely to cause great bodily injury is an inherently dangerous felony, the trial court erred by failing to instruct on this theory of voluntary manslaughter. While this appeal was pending, however, the California Supreme Court disapproved *Garcia* on this point; it held that a nonmalicious killing in the course of an inherently dangerous assaultive felony is not voluntary manslaughter, and therefore, in the case before it, the trial court did not err by failing to give a voluntary manslaughter instruction. (*People v. Bryant*, *supra*, 56 Cal.4th at p. 970.) *Bryant* requires us to reject this argument.[4]

Alternatively, defendants also argue that if assault by means of force likely to cause great bodily injury is *not* an inherently dangerous felony, then under *Burroughs*, the jury should have been instructed that any nonmalicious killing that results is involuntary manslaughter.

---

[4] *Bryant* declined to decide whether an unintentional killing in the course of an inherently dangerous assaultive felony is (1) always involuntary manslaughter, (2) involuntary manslaughter only if done with criminal negligence, or (3) no crime at all. (*People v. Bryant*, *supra*, 56 Cal.4th at pp. 970-971; see also *id*. at pp. 972-974 [conc. opn. of Kennard, J.].)

The trial court, however, did instruct that "[w]hen a person commits an unlawful killing, but does not intend to kill, and does not act with conscious disregard for human life, then the crime is involuntary manslaughter, rather than murder or voluntary manslaughter." It also instructed that "[a]n unlawful killing resulting from a willful act committed without intent to kill, and without conscious disregard of the risk to human life, is involuntary manslaughter."

Finally, the trial court also instructed that "[a] defendant commits involuntary manslaughter under the following circumstances:

"1. The defendant committed the crime of assault or battery. And,

"2. The defendant did not act with conscious disregard of the risk to human life. And,

"3. The defendant's acts unlawfully caused the death of another person."

If the jury found that defendants committed assault by means of force likely to cause great bodily injury, then it necessarily also found that they committed the lesser included offense of assault.[5] The instructions informed the jury that, in that event, it had to decide whether defendants acted with conscious disregard for human life; if so, defendants were guilty of murder, and if not, they were guilty of involuntary manslaughter. As we have already discussed in footnote 2, *ante*, evidently it found that they did act with conscious disregard.

---

**5** In light of the facts, it almost inevitably also found that defendants committed battery.

It is certainly arguable that the instruction could have been clearer and more specific regarding the application of involuntary manslaughter under these circumstances. Nevertheless, "'[a] party may not complain on appeal that an instruction correct in law and responsive to the evidence was too general or incomplete unless the party has requested appropriate clarifying or amplifying language.' [Citation.]" (*People v. Jones* (2013) 57 Cal.4th 899, 969-970.) Here, the instruction was correct, and defendants did not seek clarification.

We therefore conclude that defendants have not identified any error in the trial court's involuntary manslaughter instruction.

IV

PROSECUTORIAL MISCONDUCT IN CLOSING ARGUMENT

Defendants contend that the prosecutor committed misconduct by misstating the law in closing argument.

A.      *Additional Factual and Procedural Background.*

In closing argument, the prosecutor stated:

1. "Now, the Court read to you other instructions regarding, 'Well, could it be a voluntary manslaughter, could it be a voluntary manslaughter because of provocation?' Well, this is instruction 570. And what you need to look at, you have to, basically, show the defendant was provoked. But he just can't be provoked, as the instruction tells you, it's not enough that the defendant was simply provoked. Basically, *insulting words are*

*not enough*. You can't say, 'I was provoked, so this is why I acted this way. You can't create your own conduct, your own standard for each individual.

"*You have to look at, would a reasonable person in the same position do what they did*? No, a reasonable person would not do what they did, because what it says is a reasonable person has to be so provoked, so angry, such in the heat of passion that their reason and judgment skills are, basically, suspended, that they don't know what they're doing." (Italics added.)

2. "[F]or [imperfect self-defense] to apply to Milton, you'd actually have to believe that he actually believed that Mr. Macon was going to cut him or kill him. And, based on the evidence, that's just not reasonable. It's not believable. To believe, when you look at the video, when you look at the other witnesses, [the store clerk] who does not have a bias or motive to fabricate, and what he hears and what he sees, *it's not a reasonable belief that Milton Walker believed that he was in imminent danger*.

"Especially when he sees the man in front of him with one hand down by his side and one hand holding the door. He is not in a fighting stance. He's not sitting there holding a deadly weapon. He's sitting there, basically, with one hand down to his side, one holding the door. And he's not even looking at him . . . .

"But he believes he's in imminent danger? It's not reasonable. And it's not believable." (Italics added.)

26

B.     *Forfeiture.*

"""[A] defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion — and on the same ground — the defendant made an assignment of misconduct and requested that the jury be admonished to disregard the impropriety. [Citation.]'''  [Citations.]" (*People v. Pearson* (2013) 56 Cal.4th 393, 426.)

Here, defense counsel forfeited the claimed prosecutorial misconduct by not objecting and not requesting an admonition.

Defendants argue that the objection requirement was excused because the prosecutor's misconduct was so "systematic" that an admonition would not have cured the harm.  We cannot say that three instances of asserted misconduct over three transcript pages are either pervasive or systematic.  In any event, one reason for requiring a prompt objection is to prevent the misconduct from *becoming* pervasive and systematic.  For example, in *Jensen v. BMW of North America, Inc.* (1995) 35 Cal.App.4th 112, plaintiff's lawyer's referred to the "Lemon Law" some 14 times, in violation of the trial court's ruling on a motion in limine.  (*Id*. at pp. 129–130.)  The court stated: "[T]here is no reason to conclude a timely objection and admonition would have been ineffective to cure whatever harm occurred, and, more importantly, to prevent further reference to what [the defendant] considered an inflammatory term." (*Id*. at p. 130.)  Here, similarly, a prompt objection, if meritorious, could have nipped the supposed misconduct in the bud.

Milton also argues that his defense counsel had already "abandon[ed]" him.  In part V, *post*, we will reject this contention.  He does not contend that her failure to object

27

to the prosecutor's closing argument, standing alone, constituted ineffective assistance. We therefore conclude that Milton's present contention is barred by forfeiture.

C.      *Merits*.

Separately and alternatively, we also reject this contention on the merits.

First, defendants argue that the prosecutor's statement that, for purposes of "heat of passion" voluntary manslaughter, "insulting words are not enough," misstated the law.

We agree that "mere words" can constitute legally adequate provocation; older cases holding to the contrary are no longer good law. (*People v. Valentine* (1946) 28 Cal.2d 121, 138-144.) Defendants argue that some of the victim's provocative behavior consisted of words, particularly his threat to "cut" them. The prosecutor, however, referred specifically to "*insulting* words" (italics added), not *threatening* words. There was no evidence that Macon used any *insulting* words. Thus, the prosecutor's minor misstatement of the law was harmless. (See *People v. Seaton* (2001) 26 Cal.4th 598, 661.)

Second, defendants argue that the prosecutor's statement that, for purposes of "heat of passion" voluntary manslaughter, "You have to look at, would a reasonable person in the same position do what they did?," misstated the law.

"Heat of passion arises if, "'at the time of the killing, the reason of the accused was obscured or disturbed by passion to such an extent as would cause the ordinarily reasonable person of average disposition to act rashly and without deliberation and

28

reflection, and from such passion rather than from judgment.'" [Citation.]" (*People v. Beltran* (2013) 56 Cal.4th 935, 942.)

"Adopting a standard requiring such provocation that the ordinary person of average disposition would be moved to *kill* focuses on the wrong thing. The proper focus is placed on the defendant's state of mind, not on his particular act. To be adequate, the provocation must be one that would cause an emotion so intense that an ordinary person would simply *react*, without reflection. . . . [T]he anger or other passion must be so strong that the defendant's reaction bypassed his thought process to such an extent that judgment could not and did not intervene. Framed another way, provocation is not evaluated by whether the average person would act in a certain way: to kill. Instead, the question is whether the average person would *react* in a certain way: with his reason and judgment obscured." (*People v. Beltran*, *supra*, 56 Cal.4th at p. 949.)

"When a claim of misconduct is based on the prosecutor's comments before the jury, '"the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion."' [Citation.]" (*People v. Williams* (2013) 56 Cal.4th 630, 671.)

Here, the single sentence on which defendants focus was ambiguous. The prosecutor had just been talking about the standard for legally adequate provocation. Thus, the sentence "You have to look at, would a reasonable person in the same position do what they did?" could have meant, "would a reasonable person in the same position *have been provoked*?" or "would a reasonable person in the same position *have acted out*

29

*of passion*?," not "would a reasonable person in the same position *have killed*?" The prosecutor's next remarks indicated that he was talking about whether a reasonable person would have been provoked; he said, "No, a reasonable person would not do what they did, because what it says is a reasonable person has to be so provoked, so angry, such in the heat of passion that their reason and judgment skills are, basically, suspended, that they don't know what they're doing." Thus, he focused appropriately on defendants' state of mind, not their acts.

The jury was properly instructed that:

"A defendant kills someone because of a sudden quarrel or in the heat of passion if the following three elements are proven:

"1. The defendant was provoked.

"2. As a result of the provocation, a defendant acted *rashly and under the influence of the intensive [sic] emotion that obscured his reasoning or judgment*. And,

"3. The provocation would have caused a person of average disposition to act *rashly and without due deliberation, that is, to act from such passion rather than from judgment*. (CALCRIM No. 570, italics added.)

The jury was also instructed, "If you believe that any of the attorneys' comments on the law are different than my instructions on the law, then . . . you must disregard their comments and base your decision solely on my instructions." (CALCRIM No. 200.)

Under these circumstances, we see no reasonable likelihood that the jury understood the prosecutor to mean that "heat of passion" voluntary manslaughter

30

required provocation such that a reasonable person would have actually committed homicide.

Third, defendants argue that the prosecutor's statement that, for purposes of "imperfect self-defense" voluntary manslaughter, "it's not a reasonable belief that Milton Walker believed that he was in imminent danger," misstated the law.

"Imperfect self-defense is the killing of another human being under the actual but unreasonable belief that the killer was in imminent danger of death or great bodily injury. [Citation.]" (*People v. Booker* (2011) 51 Cal.4th 141, 182.) Thus, as a legal matter, it would be erroneous to say that defendants could not claim imperfect self-defense because it would have been unreasonable to believe they were in imminent danger.

By contrast, however, as an *evidentiary* matter, it was *relevant* that defendants' belief that they were in imminent danger was unreasonable. Imperfect self-defense requires an actual and honest belief in the need for self-defense. The fact that such a belief was unreasonable had some "tendency in reason" (Evid. Code, § 210) to prove that they did not actually hold such a belief.

Moreover, that is exactly what the prosecutor was arguing —he was asking the jury to infer, from the fact that the belief was unreasonable, that Milton did not actually hold such a belief. Thus, he argued, "[F]or [imperfect self-defense] to apply to Milton, you'd actually have to believe *that he actually believed* that Mr. Macon was going to cut him or kill him. And, based on the evidence, that's just not reasonable. *It's not believable*." (Italics added.) "'[P]rosecutors have wide latitude to draw reasonable

31

inferences from the evidence presented at trial . . . .' [Citation.]" (*People v. Tully* (2012) 54 Cal.4th 952, 1022.) That is all the prosecutor did in this instance.

We therefore conclude that there was no prosecutorial misconduct.

V

INEFFECTIVE ASSISTANCE OF COUNSEL IN CLOSING ARGUMENT

Milton contends that his trial counsel rendered ineffective assistance in closing argument.

A.      *General Legal Principles*.

"When challenging a conviction on grounds of ineffective assistance, the defendant must demonstrate counsel's inadequacy. To satisfy this burden, the defendant must first show counsel's performance was deficient, in that it fell below an objective standard of reasonableness under prevailing professional norms. Second, the defendant must show resulting prejudice, i.e., a reasonable probability that, but for counsel's deficient performance, the outcome of the proceeding would have been different. When examining an ineffective assistance claim, a reviewing court defers to counsel's reasonable tactical decisions, and there is a presumption counsel acted within the wide range of reasonable professional assistance." (*People v. Mai* (2013) 57 Cal.4th 986, 1009.)

"It is particularly difficult to prevail on an *appellate* claim of ineffective assistance. On direct appeal, a conviction will be reversed for ineffective assistance only if (1) the record affirmatively discloses counsel had no rational tactical purpose for the

challenged act or omission, (2) counsel was asked for a reason and failed to provide one, or (3) there simply could be no satisfactory explanation.  All other claims of ineffective assistance are more appropriately resolved in a habeas corpus proceeding.  [Citations.]" (*People v. Mai*, *supra*, 57 Cal.4th at p. 1009.)

"These standards apply with particular force at closing argument because . . . '[t]he decision of how to argue to the jury after the presentation of evidence is inherently tactical . . . .'  [Citation.]" (*People v. Gamache* (2010) 48 Cal.4th 347, 391.)

"[I]t is settled that it is not necessarily incompetent for an attorney to concede his or her client's guilt of a particular offense.  [Citations.]" (*People v. Lucas* (1995) 12 Cal.4th 415, 446.)  "[S]ensible concessions are an acceptable and often necessary tactic. [Citation.]" (*People v. Gamache*, *supra*, 48 Cal.4th at pp. 392-393.)  "' . . . "[G]ood trial tactics demanded complete candor" with the jury.  [Citation.]  Under the circumstances we cannot equate such candor with incompetence.'  [Citations.]" (*People v. Gurule* (2002) 28 Cal.4th 557, 612.)

B.    *Conceding Absence of Provocation*.

Milton argues that his defense counsel rendered ineffective assistance by telling the jury not to consider provocation.

1.    *Additional factual and procedural background*.

In closing argument, defense counsel stated:

a. "And, so, when you look at this whole case and you think about the fact that people were provoked, that people — let's say that people were provoked, that is not the situation here.

"Because the provocation had already occurred. . . . [H]e had cussed him out. He had threatened to cut him. And my client did nothing. Jerome did nothing."

b. "Is that provocation? They're not provoked. They're not ready to sock anybody. They're not mad. Mr. Macon is a drunk. And he's acting foolish. And they're not going to do anything . . . . Jerome begins to walk away. As this point, there's nothing about what my client did, Milton, or Jerome, that indicates that they were provoked, that they were angry.

"He's a drunk old man. Just forget about it."

c. "Mr. Macon is charging at Milton, okay? Now, all that time prior to that, Milton sat there and did nothing. Did nothing. Did nothing. Did nothing. Did nothing. Until Mr. Macon charged him.

"And so this is not a case of provocation. This case is a case of self-defense. Okay? Separate what lay people, what everybody calls provocation, . . . and the idea of self-defense. Because you will hear in the instructions, provocation relates to voluntary manslaughter.

"And this is a totally different concept."

d. "Provocation. This is where I'm telling you that there's a difference between when everyday people say provocation, as when my client said, 'I was provoked.' As

when — I don't know whether it was Jerome who said, 'I was provoked.' That is different than provocation in this particular sense.

"Provocation may reduce murder to manslaughter. I'm not asking you to reduce murder to manslaughter. I'm asking you to see what happened not as provocation, as my client would have called it, but as self-defense."

e. "Voluntary manslaughter, heat of passion and lesser included offense . . . . I'm not going to go through this, because you may want to argue that this was a heat of passion. That this was . . . heat of passion or sudden quarrel. Okay? This is not that situation. This is what happens when Mr. Macon charges my client. After that, it is still self-defense . . . ."

f. "So this is part of your instructions . . . . They do not apply in my situation. Because I'm saying that this was self-defense. And it was not provocation."

2.   *Analysis.*

We must reject this contention because defense counsel has never been asked why she made the challenged concession.

This is not a case in which there simply could be no satisfactory explanation. Defense counsel could reasonably choose to play down provocation, the better to play up self-defense. Provocation would result in a conviction for voluntary manslaughter; self-defense, on the other hand, would result in a complete acquittal. Moreover, self-defense was more closely consistent with Milton's own statements. He told the police he thought the victim had a knife. At trial, he claimed that the victim threatened to "cut" him, then

35

moved toward him; he believed the victim was about to attack him, so he punched him preemptively. This testimony, if accepted, would be sufficient to prove self-defense.[6]

By contrast, there was little evidence of provocation. Jerome claimed that Macon closed the door on his leg, then asked, "Do you know who you're messing with? I'm a Macon." However, he admitted that he ignored Macon and walked away. And Milton, as noted, testified to a classic self-defense scenario. But even assuming the jury could have found that Macon's actions constituted provocation, there was a clear tactical advantage to framing them as grounds for self-defense.

C.    *Conceding Absence of Imperfect Self-Defense*.

Milton argues that his defense counsel rendered ineffective assistance by conceding that imperfect self-defense did not apply.

1.    *Additional factual and procedural background.*

Defense counsel also stated:

"This is not a situation of imperfect self-defense . . . . That just doesn't apply. Okay? My client thought he may have had a knife. And when he charged him, he responded."

2.    *Analysis.*

Once again, defense counsel has not been asked why she made the challenged concession. And once again, this is not a case in which there simply could be no

---

[6]    Jerome's attorney took much the same approach; she argued self-defense and asked the jury to acquit her client of both murder and voluntary manslaughter.

36

satisfactory explanation. As with provocation, defense counsel could reasonably choose to emphasize "perfect" self-defense at the expense of imperfect self-defense. Perfect self-defense would be a complete defense.

D.     *Conceding Absence of "Perfect" Self-Defense.*

Milton argues that his defense counsel rendered ineffective assistance by conceding that perfect self-defense did not apply. He also argues that this concession undermined any reasonable tactical purpose that she could have had in conceding that both provocation and imperfect self-defense did not apply.

1.     *Additional Factual and Procedural Background.*

Milton's defense counsel also stated:

"As the fifth element, this was not self-defense. If this happened and this happened, he was involved in dangerous activities and he had a disregard for human life and he hurt the person and, No. 5, he was not acting in self-defense. For involuntary, you have to have a battery. The definition of battery, you know, he was hit or, you know, the person was hurt, or —

"And, then, he did not act in self-defense. So, I think, I say to you that all of these do not apply, because this was not a lawful — this was not a lawful killing."

2.     *Analysis.*

Milton misconstrues this portion of his defense counsel's argument. From her reference to the "fifth element" and "No. 5," it is clear that she was referring to the jury instruction on simple assault (CALCRIM No. 915). According to this instruction, simple

37

assault has five elements; the fifth element is that "[t]he defendant did not act in self-defense or defense of someone else." She also referred to the battery instruction (CALCRIM No. 925), which likewise required that "[t]he defendant did not act in self-defense or in defense of someone else." Both of these instructions were relevant to involuntary manslaughter. Thus, defense counsel was *actually* arguing that the assault and battery instructions and involuntary manslaughter instructions did not apply, because they required that the defendant was not acting in self-defense, and Milton *was* acting in self-defense.

Admittedly, her statement, "this was not a lawful killing," standing alone, could be construed as conceding that self-defense did not apply. In context, however, it is clear that she simply misspoke. She was already having trouble getting this sentence out; she had to restart it twice. Throughout her argument, she stated that self-defense *did* apply. No reasonable juror would have understood her to be conceding that it did not.

E.      *Conceding Causation.*

Milton argues that his defense counsel rendered ineffective assistance by conceding that it was Milton's last punch, which knocked Macon to the ground, and not Jerome's additional two or three punches, that caused the fatal skull fracture.

1.      *Additional factual and procedural background.*

Defense counsel stated:

a. "And, unfortunately, my client threw the last punch. That got him on the floor. Jerome is next to him. Goes down and punches him two more times.

38

"My client had done the damage, my client had broken his skull."

b. "Yes, Jerome hit him. But my client had done the damage. My client had hit him where his head went back and it was fractured because it hits the cement."

c. "Unfortunately, my client punched him, and he went down. And that was the reason that Mr. Macon had the crack in his head. And that was the reason that Mr. Macon died, not because Jerome came and punched him two more times."

2.     *Analysis*.

Yet again, defense counsel was not asked why she made the challenged concession. The evidence that Milton caused the skull fracture, however, was quite strong. One witness testified that, when Milton knocked Macon down, "[Macon's] head bounced three times . . . off the parking lot . . . ." Also, Milton had admitted to police that he saw Macon's head hit the ground: "Like hard. Like, you know, when your neck snap?" Once Macon hit the ground — even before Jerome hit him — he was motionless and unresisting.

When Milton testified, the prosecutor doggedly asked him whether he saw the victim's head snap back after hitting the ground; Milton just as doggedly refused to give him a straight answer. The jury undoubtedly took this, not only as evidence that Milton struck the fatal blow, and not only as evidence that Milton *knew* that he struck the fatal blow, but as evidence that Milton had little regard for his oath to tell the whole truth. His counsel could reasonably conclude that the best way to restore Milton's credibility (or at least hers) was to concede the point.

39

At the same time, even assuming that Milton did not personally cause the skull fracture, the evidence that he was guilty as an aider and abettor was also strong. Defense counsel could reasonably conclude that, by conceding that Milton caused the skull fracture, she would gain credibility but not forfeit any likely winning issue.

F.    *"Abandonment."*

Finally, Milton argues that we must presume prejudice because his defense counsel failed to subject the prosecution's case to meaningful adversarial testing. (See *United States v. Cronic* (1984) 466 U.S. 648, 659-660.)

We have already rejected Milton's ineffective assistance claims. In each instance, our rejection was not based on failure to show prejudice; rather, it was based on failure to show objectively unreasonable representation. Even when these instances are viewed collectively, rather than individually, Milton has not shown that counsel's performance was deficient. A fortiori, he has not shown that she failed to subject the prosecution's case to meaningful adversarial testing.

VI

USE OF AN IMPROPER LEGAL STANDARD

IN DENYING MILTON'S NEW TRIAL MOTION

Milton contends that the trial court erred by denying his new trial motion based on an incorrect legal standard.

A.     *Additional Factual and Procedural Background.*

Milton filed a new trial motion, arguing, among other things, that there was insufficient evidence of malice.

The trial court denied the motion. Regarding the sufficiency of the evidence, it stated:

"[T]he Court is satisfied that there is sufficient evidence to support the verdict . . . . [A]nd, of course, the Court does not reweigh the evidence or make an independent determination, the Court simply determines whether or not there was substantial evidence to support the jury's finding."

It then explained that the "uncontradicted" evidence that Jerome hit the victim after he was already down, taken together with the evidence that Milton "stood by while that was happening" and that both defendants left the victim "motionless on the ground," was "sufficient to support a finding of wanton disregard for human life."[7]

It added: "Knowledge that that kind of action[,] causing the victim's head to hit the pavement, after it had already hit the pavement, could be life-threatening, and to continue with it, is reckless disregard for human life."

B.     *Analysis.*

"'In reviewing a motion for a new trial, the trial court must weigh the evidence independently. [Citation.] It is, however, guided by a presumption in favor of the

---

[7]     Milton does not dispute the trial court's conclusion that this was sufficient evidence of malice.

correctness of the verdict and proceedings supporting it. [Citation.] The trial court "should [not] disregard the verdict . . . but instead . . . should consider the proper weight to be accorded to the evidence and then decide whether or not, in its opinion, there is sufficient credible evidence to support the verdict." [Citation.] . . .' [Citation.]" (*People v. Fuiava* (2012) 53 Cal.4th 622, 729-730.)

We may assume, without deciding, that the trial court's remarks demonstrate that it denied the motion based on the deferential "substantial evidence" standard, rather than the appropriate independent judgment standard. Even if so, Milton cannot show that the error was prejudicial, because the trial court made it clear that, even if it had exercised its independent judgment, it would still have denied the motion. It described the relevant evidence as "uncontradicted" (as indeed it was). It found not only that there was "substantial evidence" and "sufficient evidence" of malice, but additionally that defendants' conduct did actually demonstrate malice — "reckless disregard for human life."

Even if we were to remand with directions to reconsider Milton's new trial motion under the proper legal standard, we see no reasonable probability that the trial court would grant the motion. Hence, the error, if any, was not prejudicial. (See *People v. Ochoa* (1998) 19 Cal.4th 353, 476.)

## VII

## DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

RICHLI _____
Acting P. J.

We concur:


KING _____
       J.


MILLER _____
       J.